UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

BYRON M. MILES,

        Plaintiff,                Case No. 1:21-cv-74

v.                                         Honorable Janet T. Neff

G. SCANLON et al.,

        Defendants.
_____/

## OPINION

This is a civil rights action brought by a state prisoner under 42 U.S.C. § 1983. Under the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996) (PLRA), the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). Applying these standards, the Court will dismiss Plaintiff's complaint for failure to state a claim.

## Discussion

**I.    Factual allegations**

Plaintiff is presently incarcerated with the Michigan Department of Corrections (MDOC) at the Muskegon Correctional Facility (MCF) in Muskegon, Muskegon County, Michigan. The events about which he complains occurred at that facility. Plaintiff sues MCF

mailroom staff members G. Scanlon and K. Brown, MCF former business manager Bobbi Dixon-Ingalls, and MCF former warden Sherry L. Burt.

Plaintiff alleges that on July 2, 2020, he received an electronic message stating that a Jpay e-message had been discarded due to content. The e-message was from Plaintiff's family member. The attachment was a copy of a page from a book known as EL's Holy Tablets, authored by Dr. Malachi Z. York. Plaintiff claims he uses the book to exercise his religion, known as Nuwaubu. Plaintiff indicates he received a series of excerpts from the book—a total of 41 pages—during April, May, June, and July of 2020.

On July 2, Plaintiff sent a message to Defendants Scanlon and Brown asking why the book excerpt was rejected. On July 7, Scanlon responded that the excerpt was rejected because it was a printed copy of a book not sent directly from the publisher. Over the next two weeks, Plaintiff received four more notices that Jpay message attachments had been discarded. Each discarded attachment was an excerpt from the Holy Tablets.

Plaintiff filed a grievance against Brown and Scanlon. On August 11, Defendant Dixon-Ingalls, as mailroom supervisor, responded to the grievance. Dixon-Ingalls upheld the rejection. Plaintiff then appealed to Defendant Burt, who also upheld the rejection.

Plaintiff seeks injunctive relief against Defendants Scanlon and Brown, compelling them to permit the receipt of EL's Holy Tablet excerpts, those excerpts that were rejected in the past as well as any excerpts that will be sent in the future. Additionally, Plaintiff asks the Court to award punitive damages against all Defendants.

## II.     Failure to state a claim

A complaint may be dismissed for failure to state a claim if it fails "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While

a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679. Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470–71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(i)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

### III.  Liability for denying Plaintiff's grievance

Plaintiff's claims against Defendants Dixon-Ingalls and Burt are premised solely on those Defendants' denials of Plaintiff's grievance against Brown and Scanlon at Steps I and II of the administrative grievance process. (Compl., ECF No. 1, PageID.5; Grievance, ECF No. 1-6, PageID.17; Step II Grievance Response, ECF No. 1-7, PageID.18.) Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior or vicarious liability. *Iqbal*, 556 U.S. at 676; *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691(1978); *Everson v. Leis*, 556 F.3d 484, 495 (6th Cir. 2009). A claimed constitutional violation must be based upon active unconstitutional behavior. *Grinter v. Knight*, 532 F.3d 567, 575–76 (6th Cir. 2008); *Greene v. Barber*, 310 F.3d 889, 899 (6th Cir. 2002). The acts of one's subordinates are not enough, nor can supervisory liability be based upon the mere failure to act. *Grinter*, 532 F.3d at 576; *Greene*, 310 F.3d at 899; *Summers v. Leis*, 368 F.3d 881, 888 (6th Cir. 2004). Moreover, § 1983 liability may not be imposed simply because a supervisor denied an administrative grievance or failed to act based upon information contained in a grievance. *See Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999). "[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. Plaintiff has failed to allege that Defendants Dixon-Ingalls or Burt engaged in any active unconstitutional behavior. At most, Plaintiff claims these Defendants failed to correct the unconstitutional behavior of Defendants Scanlon and Brown. That is not sufficient. Accordingly, Plaintiff fails to state a claim against Defendants Dixon-Ingalls and Burt.

### IV.  First Amendment violations

The First Amendment provides: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of

4

speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I.  "[A] prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974). Plaintiff's free speech rights are "uncontrovertedly limited by virtue of [Plaintiff's] incarceration." *Thaddeus-X v. Blatter*, 175 F.3d 378, 393 (6th Cir. 1999).

Plaintiff claims that Defendants' refusals to allow his receipt of the Holy Tablets excerpts through Jpay electronic communications is a violation of his First Amendment right to freely exercise his religion.  Additionally, the Defendants' restrictions may implicate Plaintiff's First Amendment rights to receive mail or, more generally, information.

Plaintiff's complaint relies upon language from MDOC policy directive regarding incoming mail.  A review of that policy directive and related policy directives is helpful to an understanding of Plaintiff's claims.

Although Plaintiff relies on the MDOC policy directive regarding prisoner mail, that policy directive, by its terms, does not apply to the communications at issue here.  The policy directive regarding prisoner mail defines mail as "Any written, typed, or printed communication of information, including magazines, catalogs, books, and photographs."  MDOC Policy Directive 05.03.118, Prisoner Mail, ¶ A (Eff. Mar. 1, 2018) (Mail Policy).  The Mail Policy further provides that "[e]lectronic messages received through the Department's approved vendor are not considered mail for purposes of this policy."  *Id*.  Nonetheless, there is a section of the Mail Policy specifically directed to electronic messages.

The electronic message portion of the Mail Policy makes clear that "[t]he use of electronic messaging is considered a privilege."  *Id*., ¶ MMM.  Electronic messages that pose a

threat to the security, good order, or discipline of the facility must be rejected. *Id*., ¶ NNN. Whether electronic messages fall into that category is determined by the same criteria used to determine if mail falls into that category. *Id*.

MDOC Director Heidi Washington has also issued office memoranda that specifically address electronic messaging or e-mail. *See, e.g.*, MDOC Director's Office Memorandum (DOM) 2020-1. DOM 2020-1,[1] effective January 1, 2020, permits prisoners to receive e-mail subject to the following:

> Upon receipt at the facility of an e-mail sent to a prisoner, the e-mail shall be printed by designated staff (unless the prisoner is allowed access to a kiosk to read e-mail) and processed in the same manner as set forth for mail in PD 05.03.118 "Prisoner Mail." However, the written content may be read in its entirety to determine if it violates PD 05.03.118. Any e-mail that JPay has identified as including potentially suspicious content shall be read in its entirety. An e-mail that is determined to violate PD 05.03.118 shall be rejected. The intended prisoner recipient is not entitled to notice of the rejection or a hearing. Designated staff shall notify the sender, however, that the e-mail will not be delivered and the reason for the rejection through JPay. The sender may appeal the rejection in the same manner as set forth for rejected mail in PD 05.03.118. JPay will retain all messages as an archived copy.

DOM 2020-1, p.2. Thus, although the Mail Policy does not apply to e-mail directly, the Mail Policy and DOM 2020-1 provide guidance for how e-mail is to be handled and, essentially, it is to be handled the same way that regular mail is handled.

Prisoners are allowed to receive by mail books, magazines, and other publications only if:

> 1. Ordered by a member of the public from an internet vendor identified in Attachment A or from the publisher and sent directly to the prisoner by the vendor or publisher,

---

[1] There is a more recent DOM regarding electronic messages; however, DOM 2020-1 was in effect at the time Plaintiff's electronic message attachment was rejected.

> 2. Ordered by the prisoner from a vendor identified in Attachment B or from the publisher and sent directly to the prisoner from the vendor or the publisher, or
>
> 3. The prisoner is approved to take a correspondence course pursuant to PD 05.02.119 "Correspondence Courses," and the publication is sent directly from the approved correspondence school.
>
> All prisoner orders must be through established facility ordering procedures. Under no circumstances shall prisoners in a correctional facility be permitted to order a publication from an internet vendor.

Mail Policy, ¶ Z.  Mail received that does not comply with paragraph Z is deemed to pose a threat to the security, good order, or discipline of the facility and must, therefore, under all circumstances be rejected.  Mail Policy, ¶ NN.  There is one exception:  the mandatory rejection does not apply "to an article or a few pages, or copies of a few pages, from a publication that may be included with a letter or other mail, unless it is reasonably believe to be an attempt to circumvent" the paragraph Z restriction.  Mail Policy, ¶ NN 8.

Plaintiff reports that the Holy Tablets are out of print, but that they are available online through nuwaubianfacts.com.  Plaintiff attaches a page from that website to his complaint.  The website offers for sale the entire Holy Tablets, as a pdf download, for $25.00.  http://nuwaubianfacts.com/scrolls.htm (visited Apr. 19, 2021).  The site offers several other books authored by Dr. York as well.  *Id*.  It appears that a member of the public could order the pdf from the publisher to be sent directly to Plaintiff.  Plaintiff suggests that the Holy Tablets is not protected by copyright; but, based on the nuwabianfacts.com website, that does not appear to be the case.  The website does indicate that the purchaser may print the pdf file, but it does not say that the purchaser is free to print and sell, or even distribute for free, copies of the pdf file.  *Id*.

Plaintiff kited Brown and Scanlon after the initial rejection asking why the book had been rejected.  (Kite, ECF No. 1-2, PageID.11.)  Scanlon responded that the book had been rejected because the book had not been sent directly from the publisher.[2]

Plaintiff questions the legitimacy of that reason, noting the paragraph NN, subparagraph 8 exception for copies of a few pages.  Yet Plaintiff ignores the exception to the exception.  If there is a reasonable belief that providing copies of excerpts is an attempt to circumvent the restriction, the exception does not apply.  The stream of such excerpts coming in to Plaintiff certainly supports a reasonable belief that Plaintiff and his family member were attempting to circumvent the restriction a few pages at a time.

The MDOC Policy Directive regarding the religious beliefs and practices of prisoners provides that "Prisoners are allowed to receive religious reading material through the mail . . . subject to  . . . PD 05.03.118 'Prisoner Mail' . . . ."  MDOC Policy Directive 05.03.150, ¶ HH (eff Oct. 1, 2019).

While "lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights," inmates clearly retain the First Amendment protection to freely exercise their religion.  *See O'Lone v. Shabazz*, 482 U.S. 342, 348 (1987) (citations omitted).  To establish that this right has been violated, Plaintiff must establish that: (1) the belief or practice he seeks to protect is religious within his own "scheme of things," (2) that his belief is sincerely held, and (3) Defendant's behavior infringes upon this practice or belief.  *Kent v. Johnson*, 821 F.2d 1220, 1224-25 (6th Cir. 1987); *see also Flagner v. Wilkinson*, 241 F.3d 475, 481 (6th Cir. 2001) (same); *Bakr v. Johnson*, No. 95-2348,1997 WL 428903, at *2 (6th Cir. July 30, 1997) (noting that "sincerely held religious beliefs require accommodation by prison officials").  Even if Plaintiff

---

[2] When Defendants Dixon-Ingalls and Burt responded to Petitioner's grievance, they focused on the additional fact that the book was protected by copyright.  (ECF Nos. 1-6, 1-7.)

establishes those three elements, prison officials may impinge on these constitutional rights where their actions are "reasonably related to legitimate penological interests." *See Flagner*, 241 F.3d at 483 (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)).

To date, the federal courts have not determined that the "right" to email communication is as broad as the "right" to receive mail. The MDOC Director's Office Memorandum regarding e-mails and the MDOC mail policy make clear that the ability to so communicate is a privilege and that the privilege can be limited. The courts have routinely agreed. While prisoners have a First Amendment right to communicate with the outside world, *see Valdez v. Rosenbaum*, 302 F.3d 1039 (9th Cir. 2002); *Benzel v. Grammar*, 869 F.2d 1105, 1108 (8th Cir. 1989), they do not have a constitutional right to a particular form of communication, such as access to email.[3] Nonetheless, "the First Amendment protects 'the right to receive information and ideas,' which, as applicable in the prison context, extends to the right to receive mail and access

---

[3] *See, e.g., Solan v. Zickefoose*, 530 F.App'x 109, 112 (3d Cir. 2013) (BOP Program Statement regarding Federal Bureau of Prisons prisoner email system (TRULINCS) is entirely consistent with 18 U.S.C. § 4042(a)(2), which authorizes the BOP to "provide for the safekeeping, care, and subsistence" of Federal prisoners); *Lineberry v. Federal Bureau of Prisons*, 923 F. Supp. 2d 284, 293 (D.D.C. 2013) (citing cases and holding that prior iteration of BOP TRULINCS policy, PS 4500.11, is constitutional); *Hoffman v. Fed. Bureau of Prisons*, 2013 WL 5529612, *4 (S.D. Ill. Oct. 7, 2013) (the BOP's Program Statement regarding email access "easily passes the reasonableness inquiry [and] has an obvious connection to the interests of protecting the public and maintaining prison security."); *Edington v. FCI Elkton*, No. 4:14CV2397, 2015 WL 1843240, *3 (N.D. Ohio Apr. 22, 2015); *Bristow v. Amber*, No. 2:12–cv–412, 2012 WL 1963577, *2–3 (S.D. Ohio May 31, 2012) (prisoners do not have a First Amendment right to access email); *Grayson v. Federal Bureau of Prisons*, 2012 WL 380426, *3 (N.D.W.Va. Feb. 6, 2012) ("[P]risoners have no First Amendment constitutional right to access email."); *Rueb v. Zavaras*, 2011 WL 839320, *6 (D. Colo. Mar.7, 2011) (holding that inmates do not have a First Amendment right to have access to email); *Holloway v. Magness*, No. 5:07cv88, 2011 WL 204891, at *7 (E.D. Ark. Jan. 21, 2011) ("[A]ssuming that the free speech clause of the First Amendment requires prisons to permit communication between prisoners and persons outside the prison, . . . the First Amendment [does not require] that the government provide telephones, videoconferencing, email, or any of the other marvelous forms of technology that allow instantaneous communication across geographical distances; the First Amendment is a limit on the exercise of governmental power, not a source of positive obligation . . . ."); *Dunlea v. Federal Bureau of Prisons*, No. 3:10–CV–214, 2010 WL 1727838 (D. Conn. Apr. 26, 2010), *abrogated on other grounds by Analytical Diagnostic Labs, Inc. v. Kusel*, 626 F.3d 135 (2d Cir. 2010) ("Because the use of TRULINCS was a privilege, the BOP and Warden Zickefoose had complete discretion in determining whether Dunlea was entitled to use TRULINCS at all or on a limited basis.").

reading material." *Bethel v. Jenkins*, 988 F.3d 931, 938 (6th Cir. 2021) (quoting *Kleindienst v. Mandel*, 408 U.S. 753, 762 (1972)).

Certainly, even if Plaintiff may not have a "right" to the email form of communication, he might still have some right to the information so communicated. Just as certainly, however, that right would also be subject to "prison officials' need for flexibility in making day-to-day decisions on prison operations [such] that 'when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests.'" *Id.* (quoting *Turner*, 482 U.S. at 89). Thus, whether considered from the perspective of the "free exercise" right or the "mail/communication" right, an impingement on the right might be justified by legitimate penological interests.[4]

---

[4] To determine whether a prison official's actions are reasonably related to a legitimate penological interest, the Court must assess the official's actions by reference to the following factors:

   1. does there exist a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it;

   2. are there alternative means of exercising the right that remain open to prison inmates;

   3. the impact that accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally; and

   4. whether there are ready alternatives available that fully accommodate the prisoner's rights at de minimis cost to valid penological interests.

*Flagner*, 241 F.3d at 484 (quoting *Turner*, 482 U.S. at 89–91).

Failure to satisfy the first factor renders the regulation or action infirm, without regard to the remaining three factors. *Flagner*, 241 F.3d at 484 (quoting *Turner*, 482 U.S. at 89–90) ("a regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational"). If the first factor is satisfied, the remaining three factors are considered and balanced together; however, they are "not necessarily weighed evenly," but instead represent "guidelines" by which the court can assess whether the policy or action at issue is reasonably related to a legitimate penological interest. *Flagner*, 241 F.3d at 484 (citations omitted). It should further be noted that the *Turner* standard is "not a 'least restrictive alternative' test" requiring prison officials "to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." Instead, the issue is simply whether the policy or action at issue is reasonably related to a legitimate penological interest. *Id.*

Any impingement of Petitioner's rights is the product of the MDOC's "publisher only" rule—a rule "that only allow[s] prisoners to receive publications from approved publishers and vendors." *Bethel*, 988 F.3d at 940. The justification for such rules is to prevent contraband from entering into the prisons. The MDOC mail policy makes clear that the purpose of the rule is to preserve the security, good order, and discipline of the facility. MDOC Policy Directive 05.03.118, ¶NN. Such rules "have been previously upheld." *Id.*, (citing *Bell v. Wolfish*, 441 U.S. 520, 550 (1979) (regarding hardback books); *Ward v. Washtenaw Cnty. Cheriff's Dep't*, 881 F.2d 325, 329–30 (6th Cir. 1989) (regarding soft cover materials)).

Certainly, there are differences between the contraband concealment risks of a "hard copy" book and a digital book, but the threats to security from books are not only concealment of weapons or drugs. There is also the risk that the content of the publication might be detrimental to security. *Thornburgh v. Abbott*, 490 U.S. 401, 415–16 (1989). The purpose of publisher-only rules is to reduce "the administrative difficulties posed by the necessity of carefully inspecting each book mailed from unidentified sources." *Bell*, 441 U.S. at 551.

The risk that content poses a threat to security may be even greater with digital books than "hard copy" books because it is easier to surreptitiously change the content of a digital book than it is to surreptitiously change a page or a chapter in a "hard copy" book. Thus, as with "hard copy" books, the risks to security from digital books are increased when that book comes from someone other than the publisher or an approved vendor. Because reduction of that risk is plainly a legitimate penological interest, "publisher only" rules have been upheld against all sorts of challenges, even when the book rejected was as common as the Bible. *See, e.g., Garrison v. Dutcher*, No. 1:07-cv-642, 2008 WL 4534102, at *12 (W.D. Mich. Aug. 14, 2008). The Sixth Circuit has repeatedly upheld the validity of the publisher-only rule. *See Ward*, 881 F.2d at 325;

11

*Littlejohn v. Larson*, No. 89-1392, 1989 WL 147110 (6th Cir. Dec. 6, 1989); *Jourdan v. Lecureux*, No. 91-1197, 1991 WL 158680 (6th Cir. Aug. 14, 1991); *Ballard v. City of Inkster*, No. 92-1203, 1992 WL 301278 (6th Cir. Oct. 21, 1992); *Hunt v. Beckenger*, No. 97-3237, 1997 WL 778158 (6th Cir. Dec. 9, 1997); *Thompson v. Campbell*, 81 F. App'x 563 (6th Cir. 2003); *Bethel*, 988 F.3d at 938–42.

Under these circumstances, this Court "need not engage in a *Turner* analysis of this policy because precedent [binds] the district court . . . in addressing this First Amendment challenge." *Thompson*, 81 F.App'x at 569. The *Thompson* court concluded that *Bell* and *Ward* dictated the result in that case: "Nothing about the Department's policy or Thompson's challenge to it overcomes these controlling precedents." *Id*. Similarly, in Plaintiff's case, nothing about the MDOC publisher-only rule or Plaintiff's challenge to it permits the Court to ignore *Bell*, *Ward*, or the many other persuasive precedents upholding the publisher-only rule. Accordingly, Plaintiff has failed to state an actionable claim for violation of his First Amendment rights.

## Conclusion

Having conducted the review required by the Prison Litigation Reform Act, the Court determines that Plaintiff's complaint will be dismissed for failure to state a claim, under 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c). The Court must next decide whether an appeal of this action would be in good faith within the meaning of 28 U.S.C. § 1915(a)(3). *See McGore v. Wrigglesworth*, 114 F.3d 601, 611 (6th Cir. 1997). Although the Court concludes that Plaintiff's claims are properly dismissed, the Court does not conclude that any issue Plaintiff might raise on appeal would be frivolous. *Coppedge v. United States*, 369 U.S. 438, 445 (1962). Accordingly, the Court does not certify that an appeal would not be taken in good faith. Should Plaintiff appeal this decision, the Court will assess the $505.00 appellate filing fee pursuant to § 1915(b)(1), *see McGore*, 114 F.3d at 610-11, unless Plaintiff is barred from

proceeding *in forma pauperis*, *e.g.*, by the "three-strikes" rule of § 1915(g). If he is barred, he will be required to pay the $505.00 appellate filing fee in one lump sum.

This is a dismissal as described by 28 U.S.C. § 1915(g).

A judgment consistent with this opinion will be entered.


Dated:  May 6, 2021                                  /s/ Janet T. Neff
                                                                            Janet T. Neff
                                                                            United States District Judge